# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEE FRUTKIN,                                    :
          Plaintiff,                 :
                                  :
v.                                              :        3:07-cv-899 (WWE)
                                  :
WAL-MART STORES, INC.                           :
          Defendant.                 :

## MEMORANDUM OF DECISION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises from plaintiff Lee Frutkin's claim that defendant Wal-Mart

Stores, Inc.,[1] terminated him in violation of the Family and Medical Leave Act ("FMLA"),

29 U.S.C. § 2601 et seq.  Plaintiff has brought an action against defendant for violating

plaintiff's rights under the FMLA.[2]  Now pending before the Court is defendant's Motion

for Summary Judgment (Doc. #50).  Plaintiff did not file any opposition to defendant's

current motion, nor did he file an opposition to defendant's motion to dismiss.[3]  For the

reasons that follow, defendant's motion will be granted.

The Court has jurisdiction over plaintiff's claim pursuant to 28 U.S.C. § 1331.

---

[1]      Defendant claims that the proper defendant should be Wal-Mart Stores
East, L.P., the entity that actually operates the store in which plaintiff worked.  Without
agreement from plaintiff, the Court will decline to amend the case caption.

[2]      The Court has previously dismissed plaintiff's claim for negligent infliction
of emotional distress.

[3]      In light of plaintiff's failure to respond to both of defendant's substantive
motions, the Court questions whether plaintiff's counsel believed in his client's case and
what his motivation was for pursuing it.  It should be noted that the return date to
respond to defendant's motion for summary judgment was June 19, 2009.  On June 23,
plaintiff filed a motion for an extension of time until July 31, 2009 to respond nunc pro
tunc to "the Court's order dated 05/29/09."  The Court granted this motion despite
having not issued an order on May 29.  Nonetheless, plaintiff never filed any response.

1

**BACKGROUND**

Defendant has submitted a brief, a statement of facts and supporting exhibits, which reflect the following factual background.[4]

Wal-Mart Stores East, L.P. ("Wal-Mart") operates a chain of retail stores and is the operating entity of defendant Wal-Mart Stores, Inc.  Plaintiff was formerly store manager at defendant's store in Shelton, Connecticut.  Plaintiff began working for Wal-Mart in November 2001 as a Co-Manager in Training in the Shelton store.  He became the store manager of the Shelton store in 2004.  As store manager, plaintiff was responsible for day-to-day operations of the store, including, among other responsibilities, managing payroll and inventory.

In January 2006, plaintiff sought a leave of absence because he was having knee replacement surgery due to an injury unrelated to his employment at Wal-Mart. He notified the district assistant who told plaintiff to fill out the appropriate forms.  He also spoke to his supervisor, district manager Manjit Sithu, who expressed no concerns about plaintiff taking a leave of absence.

Plaintiff was absent for a little more than one month.  He, on his initiative, returned early from his leave to help with the store inventory.  At the time of his return, plaintiff testified, his doctor reluctantly cleared him to return to work.  No one at Wal-Mart expressed concern about plaintiff returning to work.  In a letter written to H. Lee Scott, Wal-Mart's Chief Executive Officer of its United States Divisions, with a copy sent

---

[4]      Because plaintiff failed to file a counter-statement of facts, pursuant to Local Rule of Civil Procedure 56(a)(1), the Court will accept the material facts asserted in the statement of facts and supported by evidence as admitted by plaintiff.

2

to Eduardo Castro Wright, Wal-Mart's Chief Executive Officer, plaintiff claimed that the early return to work slowed his recovery.

While plaintiff was out on leave, Wal-Mart reorganized its area management, specifically how regional stores were grouped.  What had been referred to as "districts" became "markets."  Because of this, the Shelton store became part of a new market, and plaintiff reported to Brian West as market manager.

Each position at Wal-Mart is identified by a "job code," which reflects an associate's[5] position, duties and wage and benefit levels.  Store managers cannot create job codes, but can hire and transfer individuals into the existing job code structure.  Store managers also cannot ignore or alter a position's job code.  Certain positions have more than one job code assigned, depending on the shift.  For example, there are three shifts for "unloaders" – associates who unload merchandise from delivery trucks and move the pallets onto the sales floor.  The first and second shifts are paid at one level, while the overnight third shift pays at a higher level.  Only associates on the third shift – from 10:00 p.m. to 7:00 a.m. – and not those on the second shift – 4:00 p.m. to 1:00 a.m. – receive a greater pay rate.

In June 2004 and again in March 2005, Wal-Mart issued its Field Hourly Associate Pay Plan to ensure that store managers were properly using the job codes. Wal-Mart expects managers to understand the differences between job codes, and managers are responsible for ensuring that they are properly applied.  They are not permitted to manipulate job codes to change an associate's rate of pay.  According to

---

[5]        In its papers, defendant refers to its employees as "associates."

3

the Pay Plan, if an associate moves to a new position for a period longer than three weeks, his job code is to be changed.

Where a predetermined job code with an associated wage rate is insufficient to fill a vacant position, the store manager is to contact his market manager to determine if an adjustment of the salary is warranted.  This process is meant to control Wal-Mart's costs and ensure that associates in the same position are paid on the same wage scale.  Failure to properly code a position would result in a higher wage being paid to the associate.

Wal-Mart provides numerous training programs to its associates.  There is also a management trainee program for store managers.  During this training, managers are given instructions on Wal-Mart's payroll systems and procedures.  Additionally, policies and procedures relating to Wal-Mart's operations are available on an online searchable database accessible to managers.  During his time at Wal-Mart, plaintiff took several training courses, including computer-based programs.

Wal-Mart utilizes a progressive form of discipline called "Coaching for Improvement."  First, an associate is given a verbal coaching, then a written coaching and then a "Decision Making Day" Coaching, which is a paid day off where the associate is asked to consider his commitment to Wal-Mart.  Steps may be skipped or repeated.  This program does not apply to instances of gross misconduct, which may subject the associate to immediate termination.  Wal-Mart maintains an "Open Door Policy" by which any associate can speak to any level of management to grieve an employment decision.

Either right before plaintiff took his leave or during the leave, West began to

4

conduct a district-wide audit of all job codes to ensure that positions were coded correctly.  In February 2006, West visited the Shelton store.  During the visit, the co-manager of the store, Charlene White, told West that she was aware of numerous incorrect job codings in the store, including an associate coded as a customer service associate although she worked on the sales floor.  White also told West that plaintiff instructed her to code second shift unloaders as if they worked the overnight third shift, thus earning more money.  White said that plaintiff had told her to do this because he was having difficulty keeping the second shift staffed.  Finally, White told West of associates in the store's apparel department coded as claims associates so that they could receive a higher wage rate.  White testified that she had advised plaintiff months prior to correct these incorrect job codings.

West conducted a review of the store's job codes and confirmed some of what White reported as well as other incorrect job codes.  West contacted Sithu who confirmed that he had advised his store managers to correct any incorrect job codes.  Sithu denied knowing that plaintiff's job codes were entered incorrectly.  Based on further investigation, West believed that plaintiff had either deliberately miscoded associates or had knowingly allowed the incorrect miscoding of associates to remain in effect.

On February 27, 2006, West and plaintiff met to discuss the miscodings.  Plaintiff agreed that several associates were not coded correctly, but claimed that he had transferred an associate and had forgotten to change the job code.  He further claimed that he coded unloaders incorrectly because he believed that they deserved to be coded into a higher wage rate.  Plaintiff drafted and signed a statement explaining

5

many of the incorrect codings.  At the time he wrote the statement, he believed it may have led to a coaching, not his termination.  During his deposition, plaintiff testified that he signed the statement despite some inaccuracies because his bosses had asked him to write it.  The inaccuracies pointed out during the deposition were small parts of the overall statement.

Plaintiff further testified that his previous district manager had caught the miscodings, so therefore, they should have been acceptable.  West stated that plaintiff did not appreciate the severity of the miscodings or believe that he had acted wrongly.  West indicated that he believed plaintiff's conduct constituted gross misconduct and demonstrated a lack of integrity.

Later that day, after the meeting between West and plaintiff, West sent an e-mail to Sam Sanchez, Regional Human Resources Director, and Lance de la Rosa, Regional Manager, advising them of the situation.  He wrote that plaintiff lacked "managerial courage."

Around this time, in early March, the Shelton store was preparing for inventory, a major task requiring weeks of preparation.  The process takes several days and involves a team from a third-party company counting each piece of merchandise in a store.  After starting the inventory, the inventory team learned that plaintiff had contracted with and had been paying an off-site warehouse to store merchandise that had not been placed on the sales floor for sale.  This merchandise was therefore not being offered for sale – a concern for West.  The inventory team also noted disorganized merchandise randomly appearing on shelves.  Because of the problems in Shelton, West had to be called in.

6

On March 2, 2006, West and plaintiff met in the Shelton store.  West instructed plaintiff to turn in his keys, telling plaintiff that he would decide overnight whether to terminate plaintiff's employment.  The following day, West and plaintiff met at West's office in the New Haven store where plaintiff was told that he was being terminated.  On his Exit Interview Form, plaintiff was informed that he was being terminated for miscoding associates.  Plaintiff signed the form without comment.  He later testified that the reasons for his termination were accurate.

After his termination, plaintiff, in accordance with the Open Doors Policy, contacted de la Rosa, West's direct supervisor.  After an inquiry, de la Rosa upheld the termination.  He was not aware that plaintiff had recently taken FMLA leave.

Plaintiff then contacted Hank Mullany, Vice President of the Eastern Region. Mullany spoke with de la Rosa and upheld the termination.  Mullany was not aware that plaintiff had recently taken FMLA leave.

Next, plaintiff sent a letter to Scott, with a copy to Wright.  In the letter, plaintiff wrote, in part:

> I realize I did wrong and know I should be reprimanded but I did not think termination was warranted.  My question is why was I signaled out in the entire state and no one else goes [punished] like myself.  I know you may not read this but [as] someone higher up than divisional I would like [you] to read this.

Divisional Human Resources Manager Mariana Brugger was assigned to review plaintiff's concerns.  At the time, defendant claims, Brugger was unfamiliar with Wal-Mart's coding policies and procedures.  Brugger reviewed the matter and learned that other associates had used plaintiff's name when inputting job codes.  She thus believed

7

that there was no way to confirm who had entered the job codes to authorize the miscodings.  Brugger concluded that the miscoding of certain other associates was unintentional and should have led to a Decision Making Day Coaching.  Brugger had assumed that plaintiff was not aware of the incorrect job codes.

Brugger agreed that plaintiff had violated corporate policies but believed that he should be given a second chance.  Brugger informed plaintiff that there were no available store manager positions in Connecticut, but she was able to offer him a position as co-manger of the Waterford, Connecticut store.  Plaintiff rejected this offer because it was too far from his home.  Plaintiff similarly rejected an offer to be co-manager at the Guilford, Connecticut store.

Plaintiff testified that Brugger told him that he was "singled out."  Plaintiff could not elaborate about this.  Brugger stated in her declaration that she had not meant that he had been singled out because he had taken FMLA leave as she was not aware that he had done so.

Plaintiff further testified that he had heard of three other store managers having job code violations, and the store managers were not terminated.  He has no personal knowledge of this.

The only comment that plaintiff testified hearing about his leave was West asking him if he was going to be able to do what he had to do in the store given his injury.  Plaintiff did not interpret this comment as malicious.

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to

8

any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

The FMLA prohibits an employer from interfering with an employee's right to

9

exercise his rights under the FMLA.  29 U.S.C. § 2615.  Interference includes retaliating against an employee who takes such leave.  29 C.F.R. § 825.220(c).  Such a claim is evaluated under the familiar <u>McDonnell Douglas</u> rubric.  <u>See</u> <u>Potenza v. City of New York</u>, 365 F.3d 165, 168 (2d Cir. 2004); <u>see also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804 (1973).

To make out a prima facie case, plaintiff must prove that (1) he was qualified for the job at the time of the adverse employment action; (2) he was subjected to an adverse employment action; (3) he exercised his FMLA rights; and (4) the adverse employment action occurred under circumstances raising a reasonable inference of retaliatory intent.  <u>Potenza</u>, 365 F.3d at 168.

If plaintiff establishes a prima facie case, defendant must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action.  Plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515 (1993).  A plaintiff bears a minimal burden on the prima facie case and need only demonstrate that he posses the basic skill necessary for the performance of the job.

Even if the Court were to assume that plaintiff could meet his burden in demonstrating that he was qualified for the position of store manager following his admission of purposely miscoding job codes, plaintiff would still be unable to show that his termination occurred under circumstances that would raise a reasonable inference of discrimination against him for having taken FMLA leave.

Plaintiff's arguments, which come forth only in his deposition and to the extent that defendant makes them for him, can be summed up as follows: first, West

10

questioned whether he could perform his duties given his knee injury; second, plaintiff's punishment was in excess of what he expected to receive; and three, other store managers who falsified job codes were not terminated.  The Court will address each issue in turn.

As to the first comment, there is no evidence that West's question to plaintiff was an explicit reference to his having taken FMLA leave.  Cf. Weinstock v. Columbia Univ., 224 F.3d 33, 43 (2d Cir. 2000) (Title VII case; finding that references to plaintiff as "nice" or "nurturing," if made, were not directed to her gender).  Second, a reasonable jury could not construe this comment as retaliation for plaintiff having taken leave, but only as a comment by a supervisor ensuring that an employee could physically perform an intensive task.  The comment lacks any sort of indicia of retaliation.

Similarly, the fact that plaintiff received a harsher punishment than expected cannot, by itself, serve as evidence of a discriminatory or retaliatory intent.  See Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.").  In light of defendant's need for uniformity and strict controls over wages, salaries and benefits, plaintiff's mistake cannot defeat summary judgment.

Finally, plaintiff argues that he suffered retaliation because (1) he had never been punished for miscodings and (2) he knew of other store managers who miscoded who were not similarly punished.  This argument must also fail.  Simply because plaintiff was caught with his hand in the cookie jar and terminated does not mean that his termination was based on a retaliatory animus.  An action that is wrong does not become right simply by being unnoticed.

11

As to the other store managers, plaintiff has failed to identify them.  For employees to be similarly situated, and thus able to serve as comparators for establishing an inference of discrimination, they must be similarly situated "in all material respects."  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).  Although "as a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury[,] ... this rule is not absolute ... and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

Plaintiff has failed to produce any evidence regarding these comparators, including their names or their actions that may be analogous to plaintiff's.  In sum, plaintiff's allegations comprise conclusory statements that are insufficient to defeat summary judgment.  See Shumway, 118 F.3d at 65 ("[Plaintiff]'s allegations, generously construed, are little more than conclusory statements of no probative value ... [that] do not raise a genuine issue of material fact.").  Because there is no evidence upon which a reasonable jury could find that plaintiff was treated differently from any similarly situated comparator on account of his having taken FMLA leave, plaintiff has failed to raise an inference of discrimination.  Therefore, summary judgment is appropriate.

**CONCLUSION**

For the foregoing reasons, defendant's Motion for Summary Judgment (Doc.

#50) is GRANTED.

Dated at Bridgeport, Connecticut, this 5th day of October, 2009.


_____/s/_____
Warren W. Eginton
Senior United States District Judge